NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER

Electronically Filed
Intermediate Court of Appeals
CAAP-13-0005758
29-MAY-2015
08:33 AM

NO. CAAP-13-0005758

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


EUSTAQUIO UY and CARMELITA UY,
Plaintiffs/Appellants/Cross-Appellees,
v.
SPENCER HOMES, INC., A DOMESTIC FOR-PROFIT CORPORATION,
Defendant/Cross-Claim Plaintiff/Cross-Claim
Defendant/Appellee/Cross-Appellant,

MICHAEL RILEY AND JADE RILEY, AS PARENTS OR GUARDIANS OF M.R.,
A MINOR; MICHAEL RILEY, AN INDIVIDUAL;
JADE RILEY, AN INDIVIDUAL,
Defendants/Cross-Claim Plaintiffs/Cross-Claim
Defendants/Appellee/Cross-Appellee,

RAE INOKUMA, AS PARENT OR GUARDIAN OF K.I., A MINOR;
and RAE INOKUMA, AN INDIVIDUAL,
Defendant/Cross-Claim Defendant/Cross-Claim
Plaintiff/Appellee/Cross-Appellant,

M.K. III, AN INDIVIDUAL; LUANA KAUPE, AN INDIVIDUAL; K.R.,
AN INDIVIDUAL; MARILYN REINHARDT-ORTIZ, AN INDIVIDUAL,
Defendants/Appellees/Cross-Claim Defendants/Cross-Appellees,

JOHN DOES 2-10, JANE DOES 6-10, DOE CORPORATIONS 1-10,
DOE PARTNERSHIPS 1-10, AND DOE GOVERNMENTAL ENTITIES 1-10,
Defendants/Appellees


APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CIVIL NO. 09-1-0947)

MEMORANDUM OPINION
(By:  Foley, Presiding J. and Fujise, J.,
with Ginoza, J. concurring and dissenting separately)

This case arises from property damage to a house caused by a water tanker truck after it was operated and abandoned by allegedly drunk teenagers.  Plaintiffs/Appellants/Cross-Appellees

Eustaquio Uy (**Eustaquio**) and Carmelita Uy (**Carmelita**) (together, the **Uys**) appeal from the Circuit Court of the Second Circuit's[1] (**circuit court**):

(1) "Third Amended Final Judgment" filed on November 14, 2013;

(2) "Order Granting Defendant Spencer Homes, Inc.'s Motion for Judgment as a Matter of Law, and Defendant Rae Inokuma, Individually, and as Parent to K.I., a Minor's Joinder to Motion, as to Plaintiffs' Claim for Stigma Damages, filed 7/30/12" filed on September 24, 2012 (**Stigma Damages Order**);

(3) "Order Granting Defendant Spencer Homes, Inc.'s Motion for Judgment Notwithstanding the Verdict With Regard to the Jury's Award of Punitive Damages, filed 8/15/12" filed on September 28, 2012 (**Punitive Damages Order**);

(4) "Order Denying Plaintiffs' Motion for Prejudgment Interest Filed on 9/6/12" filed on November 14, 2012;

(5) "Order Granting in Part and Denying in Part Plaintiffs' Motion for Taxation of Costs Against Defendants Filed on 9/6/12" filed on November 14, 2012 (**First Order on Taxation of Costs**);

(6) "Order Granting Defendant Rae Inokuma, Individually and as Parent or Guardian of K.I., a Minor's, Motion for Taxation of Costs Against [the Uys], filed on August 30, 2012" filed on November 23, 2012 (**Second Order on Taxation of Costs**); and

(7) "Order Granting Defendant Spencer Homes, Inc.'s Motion for Costs Against [the Uys] filed on 9/7/12" filed on November 23, 2012.

Defendant/Cross-Claim Plaintiff/Cross-Claim Defendant/ Appellee/Cross-Appellant Spencer Homes, Inc. (**Spencer Homes**) cross-appeals from the "Third Amended Final Judgment" filed on November 14, 2013, and the circuit court's "Order Denying Spencer Homes, Inc.'s Motion for Judgment as a Matter of Law that Defendant Spencer Homes Owes No Duty to Plaintiffs" filed on September 28, 2012 (**Order Denying Spencer Homes' Motion for JMOL on Duty**).

---

[1] The Honorable Rhonda I.L. Loo presided.

2

Defendant/Cross-Claim Defendant/Cross-Claim Plaintiff/Appellee/Cross-Appellant Rae Inokuma (**Inokuma**), individually and as parent or guardian of "K.I.," cross-appeals from the "Third Amended Final Judgment" filed November 14, 2013.

On appeal, the Uys contend[2] that the circuit court erred by:

(1) granting, with prejudice, Spencer Homes' motion for summary judgment as to all claims for bodily injury;

(2) deeming relevant and admissible evidence of the Uy's collateral sources of funds, including homeowners insurance, in order to prove bias, interest, or motive;

(3) excluding the Uys' evidence explaining their reasons for filing suit, which was that the Uys believed the offer from their homeowners insurance company would not be adequate to fix their home;

(4) granting Spencer Homes' motion for directed verdict on the issue of stigma damages;

(5) granting Spencer Homes' motion for judgment notwithstanding the verdict with regard to the jury's award of punitive damages; and

(6) enforcing the $50,000 offer made by Spencer Homes and Inokuma pursuant to Hawai'i Rules of Civil Procedure (**HRCP**) Rule 68.

On cross-appeal, Spencer Homes contends that the circuit court erred by:

(1) denying Spencer Homes' motion for judgment regarding its duty to the Uys and thereby finding Spencer Homes owed a duty to protect the Uys from the criminal acts of third parties; and

(2) denying Spencer Homes' motion for judgment notwithstanding the verdict regarding Spencer Homes' duty to the

---

[2] The Uys' opening brief fails to comply with Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(3) because it does not contain accurate citations to the record; the Uys' opening brief cites to "ROA" but does not specify the volume of the Record on Appeal (**ROA**) to which it refers, and the Uys' page citations do not appear to correspond with any volume of the ROA. See HRAP Rule 28(b)(3) ("Record references shall include page citations and the volume number, if applicable.").

3

Uys, again thereby finding that Spencer Homes owed a duty to protect the Uys from the criminal acts of third parties.

On cross-appeal, Inokuma contends that the circuit court erred by:

(1) denying Inokuma's motion for judgment as a matter of law (**JMOL**) as to the inapplicability of Hawaii Revised Statutes (**HRS**) § 663-41 (Supp. 2014)[3] to the instant case because there was inadequate evidence to support findings against Inokuma and the statute was unconstitutionally vague;

(2) denying Inokuma's motion for JMOL as to the inexistence of her legal duty to control the intentional criminal conduct of Defendant M.K., the son of Defendant Luana Kaupe; M.R., the son of Defendants Michael and Jade Riley (collectively, the **Rileys**); and K.R., the son of Defendant Marilyn Reinhardt-Ortiz (**Reinhardt-Ortiz**), and/or that the intentional criminal conduct of M.K., M.R., and K.R. constituted a superseding cause of the Uys' damages; and

(3) denying Inokuma's motion for JMOL on the issue of punitive damages.

## I. BACKGROUND

In the early morning on December 16, 2007, a water tanker truck belonging to Spencer Homes rolled down a hill and on to the Uys' property in Wailuku, Maui, causing damage to their rock wall and home. Later that morning, C.M., a friend of M.K.,

---

[3] HRS § 663-41(a) provides, in pertinent part:

**§663-41 Right of action.** (a) Any person twenty-one years or older who:

(1) Sells, furnishes, or provides alcoholic beverages to a person under the age of twenty-one years; or

(2) Owns, occupies, or controls premises on which alcoholic beverages are consumed by any person under twenty-one years of age, and who knows of alcohol consumption by persons under twenty-one years of age on such premises, and who reasonably could have prohibited or prevented such alcohol consumption;

shall be liable for all injuries or damages caused by the intoxicated person under twenty-one years of age.

4

filed an "unauthorized control of propelled vehicle" report with Maui County Police Department that led to the arrest of M.K.

By letter dated March 27, 2009 and addressed to the Uys, an Allstate Insurance Company (**Allstate**) agent stated, in part:

> As previously discussed, we were waiting to hear back from you and your contractor to further discuss the necessary repairs to your home as a result of this loss. Unfortunately, we have not yet heard back from either of you.
>
> In an effort to expedite your claim, enclosed please find a copy of our MSB Adjuster Summary pertaining to the damages to your home due to this incident, and a two-party settlement check in the amount of $18,866.08 which corresponds to this Summary.

In a repair estimate dated August 28, 2009, Badua Contracting, LLC quoted $119,790.90 (**Badua Estimate**) as the cost to repair the Uys' home. In a repair estimate dated September 20, 2009, Charles Sohn Construction Co., Inc. quoted $127,423.14 (**Sohn Estimate**) as the cost of repairing the Uys' home. In an email dated November 16, 2010, David Knox (**Knox**) of ConstRX, Ltd. stated that he had conducted an analysis of the project site and his company could undertake the repair of the Uys' home for an estimated cost of $25,158.

In a "Purchase Contract" and an "'As Is' Condition Addendum," both dated November 6, 2009, the Uys contracted to sell their home for $375,000 upon the "special term" that the Uys agreed "to complete repairs to the damaged building structure prior to closing." The Uys did not repair or sell their home.[4]

A. **The pleadings and pre-trial proceedings**

On December 14, 2009, the Uys filed their complaint (**Complaint**) and demand for jury trial, which named as defendants: Spencer Homes; the parents or guardians of minors M.K., M.R., K.R., and Jane Doe (collectively, **Defendants**). The Uys alleged that Spencer Homes "negligently failed to secure the water tanker heavy equipment by failing to restrict access and by leaving a key in the water tanker heavy equipment." The Uys further alleged that the water tanker truck "rolled downhill, over the

---

[4] At trial on July 19, 2012, Carmelita testified that the Uys paid approximately $4,000 to repair the wall and fence.

[their] rock wall and lawn, and crashed into their home, causing substantial damage." The Uys also alleged that the minor defendants' parents or guardians "may have contributed to or be directly or vicariously responsible for the injuries suffered by [the Uys] . . . ."

The Complaint includes eight claims for relief. The first claim alleged that Spencer Homes was liable to the Uys for negligence and gross negligence because it breached its "duty to exercise reasonable care to eliminate and/or protect against hazards to residents in the area where its heavy equipment was used and stored." The second claim alleged that the minor Defendants' parents or guardians were liable to the Uys for negligence and gross negligence because they failed "to protect against their children entering" the water tanker truck owned by Spencer Homes. The third claim alleged that Spencer Homes was liable to the Uys because it failed to protect against a known hazard - the "unattended, unlocked, and accessible" water tanker truck. The fourth claim alleged that Spencer Homes was liable to the Uys because the water tanker truck was an attractive nuisance. The fifth claim alleged that all defendants were liable for negligent infliction of emotional distress because the Uys "suffered severe and devastating emotional distress as a result of [Spencer Homes' water tanker] truck crashing into their home in the middle of the night[.]" The sixth claim alleged that all Defendants were liable for the Uys' economic losses incurred as a result of the accident. The seventh claim alleged that all Defendants were liable for the Uys' loss of consortium that resulted from the accident. The eighth claim alleged that all Defendants were liable for punitive damages.

On March 29, 2010, Spencer Homes filed its answer to the Uys' First Amended Complaint. Spencer Homes contended, inter alia, that its alleged negligent acts or omissions were not the cause of the accident, it had no duty to the Uys, it breached no duty to the Uys, the alleged negligent acts or omissions of the other Defendants caused the accident, and that the Uys were precluded from recovery because they failed to mitigate their damages.

On September 21, 2010, the Uys filed a "Second Amended Complaint" adding Luana Kaupe, the Rileys, Reinhardt-Ortiz, K.R., and Inokuma as defendants. The Second Amended Complaint alleged that Inokuma was liable for negligence because on December 15, 2007, she "furnished and/or permitted alcohol to be consumed in her home" by the defendants who were minors at the time of the accident.

On October 7, 2010, Spencer Homes filed its answer to the Second Amended Complaint and a cross-claim against M.K., Luana Kaupe, the Rileys, M.R., Reinhardt-Ortiz, and Inokuma. Spencer Homes' cross-claim alleged that if Spencer Homes "was in any way negligent, engaged in any wrongful conduct and/or failed any duty," it should be fully indemnified by the cross-defendants because while their "negligence, omissions, and/or other wrongful conduct was active and primary," Spencer Homes "was only secondary and passive[.]"

On October 14, 2010, Inokuma filed her answer to the Second Amended Complaint and a cross-claim against Spencer Homes, M.K., Luana Kaupe, the Rileys, K.R., and Reinhardt-Ortiz. Inokuma's cross-claim essentially alleged that she was in no way liable for the damage to the Uys' home and that the actions or omissions of the other Defendants caused the accident. Inokuma's cross-claim also alleged that if she was found liable, the other Defendants must be found jointly and severally liable and Inokuma must be found "entitled to reimbursement, contribution, and/or indemnity from Cross-Claim Defendants."

Inokuma testified to the following version of events in her January 12, 2011 deposition. At the time of the water tanker truck accident, Inokuma lived at her house in Wailuku (the **Inokuma residence**) with her boyfriend and two of her three daughters. On December 15, 2007, she and her boyfriend returned home from dinner around 9 p.m. and went to her bedroom around 10:00 p.m. Inokuma's daughters, R.I. and K.I., were home at the time. Sometime around 11 P.M. or midnight, Inokuma woke up because she heard loud noises coming from the garage area. Inokuma heard people "talking and laughing and screaming and tickling." Inokuma went to the garage door to tell K.I. to come

in the house and saw a truck in the driveway. K.I., K.I.'s boyfriend – M.K., C.M., and others were in the garage and on the driveway. Inokuma was upset and told K.I. to come in the house and the others to leave. K.I. complied and her visitors packed up their things and someone started up the truck. Inokuma went back to bed. Inokuma awoke later that night when she heard what she believed to be K.I. and someone talking in the garage. Because Inokuma did not feel well and did not want to leave her bedroom, she called K.I.'s cell phone and told her to come back into the house. K.I. complied and told Inokuma "good night." Early the next morning, Inokuma received a call from Mark Spencer (**Spencer**), the project manager for Spencer Homes at the time of the incident, from K.I.'s phone. Inokuma believes that Spencer said "I've just found [K.I.'s] phone in one of my water trucks that ran into your neighbor's yard." Inokuma got up to check on K.I. and found her and M.K. in K.I.'s room, another person sleeping on the floor in K.I.'s room, and "people all over the living room."

Inokuma denied witnessing her daughters or any of their friends consuming alcohol at the Inokuma residence. Inokuma stated that she prohibited underage drinking in her house and her daughters knew of this rule, but she kept wine, beer, and hard liquor in the house.

In his February 24, 2011 deposition, Spencer said that to his best recollection, in December 2007, Spencer Homes stored three or four water tanker trucks adjacent to the Waikapu Subdivision construction site in an open field. Spencer stated that "[t]here would normally be a set area where [the water tanker truck] was parked. As we moved through the site work for such a large project, that site would move as we moved with the – our site work." Spencer said Spencer Homes kept the keys to its heavy equipment in its office and issued keys to certain employees that drove the heavy equipment on a daily basis.

In his March 28, 2011 deposition, Spencer Homes' representative David Brown (**Brown**) testified that he "believed" the water tanker truck had door locks in December 2007 but did not know if they were in working condition at that time; the door

locks on the water tanker truck were currently not working; the normal practice was for the employee who was the last to use the water tanker truck was the one who had the keys; he was not aware of the identity of the last employee that drove the water tanker truck before the accident; and he did not know if Spencer Homes kept a record of which employee drove which equipment on any given day. Brown agreed that the operation of the water tanker truck by an untrained person could be a threat to the safety of the motoring public.

On May 18, 2011, Spencer Homes and Inokuma jointly offered a pretrial settlement offer of $50,000 pursuant to HRCP Rule 68,[5] which the Uys rejected.

On August 18, 2011, Spencer Homes moved for summary judgment on the Uys' bodily injury claims. Spencer Homes argued that the Uys' bodily injury claims were barred because they were not pled in conformance with the requirements to sustain a tort claim under HRS § 431:10C-306(b)(1)-(4) (2005 Repl.).[6]

---

[5] HRCP Rule 68, provides, in pertinent part:

**Rule 68.    OFFER OF SETTLEMENT OR JUDGMENT.**

At any time more than 10 days before the trial begins, any party may serve upon any adverse party an offer of settlement or an offer to allow judgment to be taken against either party for the money or property or to the effect specified in the offer, with costs then accrued. . . . If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.

[6] HRS § 431:10C-306 abolishes tort liability for "accidental harm arising from motor vehicle accidents occurring in this State" but provides in part that:

**§431:10C-306 Abolition of tort liability.**

. . . .

(b)    Tort liability is not abolished as to the following persons, their personal representatives, or their legal guardians in the following circumstances:

(1)    Death occurs to the person in such a motor vehicle accident;

(2)    Injury occurs to the person which consists, in whole or in part, in a significant permanent loss of use of a part or function of the body;

(3)    Injury occurs to the person which consists of a permanent and serious disfigurement which

On September 19, 2011, the Uys filed their opposition to Spencer Homes' motion for summary judgment on bodily injury claims. The Uys argued that HRS § 431:10C-306(e)(1) (2005 Repl.) exempted their claims from the $5,000 threshold under HRS § 431:10C-306(b)(4) because Spencer Homes failed to maintain its equipment in a non-defective state. HRS § 431:10C-306(e)(1) provides:

> (e) No provision of this article shall be construed to exonerate, or in any manner to limit:
>
> (1) The liability of any person in the business of manufacturing, retailing, repairing, servicing, or otherwise maintaining motor vehicles, arising from a defect in a motor vehicle caused, or not corrected, by an act or omission in the manufacturing, retailing, repairing, servicing, or other maintenance of a vehicle in the course of the person's business[.]

On October 20, 2011, the circuit court entered the order granting Spencer Homes' motion for summary judgment as to all claims for bodily injury.

On February 9, 2012, the Uys filed their motion in limine no. 1 to exclude references to the their homeowners' insurance, interactions between them and their insurance companies after the collision, and any offers made by their insurance company for the repair of their home.

On July 18, 2012, the circuit court granted the Uys' motion in limine no. 1 to preclude evidence of the Uys' homeowners insurance and any adjuster summaries or offers.

On February 13, 2012, Spencer Homes filed their motion in limine no. 5 to preclude the Uys' punitive damages claim against Spencer Homes.

**B.     The testimonies of M.K. and M.R.**

M.K., who was seventeen years old at the time of the water tanker truck accident, testified at trial to the following version of events. On the evening of December 15, 2007, M.K.

---

> results in subjection of the injured person to mental or emotional suffering; or
>
> (4) Injury occurs to the person in a motor vehicle accident and as a result of such injury that the personal injury protection benefits incurred by such person equal or exceed $5,000[.]

10

went to the Inokuma residence to hang out with K.I. and two of her girlfriends. C.M. picked up M.K., K.I., and one of K.I.'s girlfriends, and they drove to pick up M.R. The group then drove to Hawaiian Homes to pick up another friend. The group then drank vodka, provided by C.M., out of water bottles while "cruising" in the car for about two hours, and then drove to Lower Waiehu Beach. After hanging out at the beach for a while the group left. They drank some more vodka in the car while driving to pick up K.R. at Hawaiian Homes and dropping off the other friend. They drove to the Inokuma residence, arriving around 10 or 11 p.m.

The group entered the Inokuma residence through the front door and "talked story" in the living room while drinking more vodka. When their two water bottles from earlier in the night were empty, M.K. grabbed vodka from Inokuma's kitchen, went in to K.I.'s room, and filled the bottles up with Inokuma's vodka so that the group could continue drinking. The group hung out in the living room and K.I.'s bedroom for about an hour or two and consumed "more than two [water] bottles" of vodka, one of which was filled with Inokuma's vodka. On a scale of one to ten, M.K.'s level of intoxication at the Inokuma residence after midnight was a "ten or 11." While they were drinking, Inokuma came out of her bedroom, walked through the living room past the group, went into the kitchen to get a glass of water, and then went back to her bedroom. Sometime thereafter, C.M., Nohea, and K.I. fell asleep.

Around 2 or 3 a.m., M.K. asked C.M. if he could borrow his truck to go get food with M.R. and K.R., and C.M. said "yeah, yeah, go." On the way to get food, M.K. "got crazy on the side of" a dirt road in Wailuku and tried to do "doughnuts" with the truck. He lost control of the truck and crashed into a ditch. Unable to get the truck out of the ditch, M.K., M.R., and K.R. began walking back to the Inokuma residence. The three young men took a shortcut through an unlit construction site and found a water tanker truck that was not guarded by a fence or a security guard and had no blocks around the tires. After jumping up on the truck and discovering that the doors were unlocked, they

11

entered the truck and discovered that the keys were in the ignition. With M.R. and K.R. as passengers, M.K. turned the truck on and started driving it towards another construction site near the Inokuma residence where he intended to drop it off.

When the three young men drove up on the second construction site, M.K. saw a security guard on duty at the site and turned the water tanker truck around so that it was facing downhhill. When the security guard came up right behind the water tanker truck, the young men "panicked," M.K. stopped the truck and turned it off, and then the three young men jumped out of the truck and started running to the Inokuma residence. As he was running, M.K. saw the water tanker truck roll down the hill in the direction of the Uys' house and heard the truck crashing into their house after he had run out of view. M.K. was arrested the next morning at the Inokuma residence.

M.R., who was fifteen years old at the time of the water tanker truck accident, also testified at trial. His testimony corroborated M.K.'s, except that M.R. testified the group drank vodka and rum at the Inokuma residence on the night of the water tanker truck accident. He also testified that while at the Inokuma residence, the group drank the alcohol from liquor bottles, not water bottles and that M.K. took C.M.'s truck without asking because C.M. was asleep and that C.M. had let M.K. borrow his truck in the past. M.R. testified that he believed Inokuma was home while they were drinking because her bedroom light was on when they got there. M.R. stated that the group drank in the Inokuma residence living room for a few hours with the lights on while watching TV and were not trying to be quiet. M.R. stated that at the time of the accident his level of intoxication was a "ten out of ten." On the morning of December 16, 2007, C.M. woke him up at the Inokuma residence to say his truck was stolen.

M.K. and M.R. also testified about their history of drinking alcohol at the Inokuma residence prior to the accident. M.K. testified that during the fall of 2007, he and M.R. drank alcohol at the Inokuma residence at least once a week on the weekends; never took alcohol with them to the Inokuma residence;

that Inokuma kept wine, beer, and liquor in the house and had served M.K. alcohol at least once a week; that Inokuma would drink alcohol with her daughters and certain friends such as himself and M.R.; that he had permission to help himself to Inokuma's alcohol and that Inokuma had witnessed him helping himself to her alcohol; and that he considered all of the alcohol he drank at the Inokuma residence to belong to Inokuma. M.R. testified that on Friday and Saturday nights during the fall of 2007, he and his friends drank alcohol at the Inokuma residence. On the weekends, Inokuma would be home and would witness M.R. and his friends drinking alcohol. M.R. testified that Inokuma provided the alcohol and sometimes drank alcohol with them; that he would get "very intoxicated" at the Inokuma residence and sometimes "black out" and "puke"; and that he would sleep in the living room of the Inokuma residence after drinking, waking the next morning with a hangover.

C.   **Repair costs and insurance.**

On July 17, 2012, Arne LaPrade (**LaPrade**), a witness with expertise in building construction and the scope and cost of construction repairs, testified that the cost to repair the Uys' home in 2011 would have been $93,000. LaPrade testified that his recommended repairs would correct all accident-related damage and restore the house to its pre-accident condition.

On July 19, 2012, Carmelita testified that she and Eustaquio paid $720,090 for the home in July 2006. Carmelita testified that after the accident she called her insurance company and contractors to get a estimate for the cost of repairing the damage. Carmelita testified, "I did call several contractors to come to my house. They did come. They look at it. They never come back to fix our house." Carmelita testified that they attempted to sell their home in its unrepaired state in June 2009 with a listed price of $575,000. Carmelita testified that they received only one offer of $375,000 in November 2009, but that they did not accept the offer because it was contingent on the completion of the repairs on the house and they had not fixed the house.

At the July 19, 2012 hearing, Inokuma's attorney, Curtis C. Kim (**Kim**) argued that the circuit court should revisit its grant of the Uys' motion in limine no. 1. Kim argued that the prohibition against references to liability insurance under Hawaii Rules of Evidence (**HRE**) Rule 411[7] was inapplicable because it pertained only to the liability insurance of tortfeasors and further, the Allstate letter was being offered for the purpose of refuting the Uys' position that they did not have the opportunity to fix their house. Kim argued the Uys were "trying to portray this case as one in which these poor people simply had no means and no opportunity to fix their house. . . . And it's totally inaccurate and totally untrue. . . . That is straight bias, interest, or motive evidence." The Uys argued that evidence of their homeowners' insurance was barred by the collateral source rule. The circuit court stated that it felt it had "to give defense counsel some leeway into following up as far as bias, interest, and motive" but the ruling on motion in limine no. 1 still stood. The circuit court sought suggestions from counsel about whether a particular limiting instruction could be given to the jury to keep questions about the Uys' homeowner's insurance "proper."

At its July 23, 2012 hearing, the circuit court stated that it would allow Kim to inquire into whether the home could have been repaired and the Uys' decision not to pursue that avenue. At this hearing, the Uys offered Carmelita as an expert in the field of real estate. Carmelita testified that she had been a licensed realtor since 2004, had not researched the value of homes that had been similarly damaged, and had "no idea" what the value for a home that had been damaged would be. The circuit

---

[7]     HRE Rule 411 provides:

> **Rule 411 Liability insurance.** Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

court found Carmelita to be an expert in the field of real estate, but not in the field of damaged homes or stigma damages.

Kim introduced into evidence, a notice of intent to foreclose on the Uys' home into evidence. Kim also introduced documents titled "Short Sale Addendum to Purchase Contract" and "Distressed Property Addendum to Purchase Contract" which referenced the proposed November 6, 2009 purchase contract for the Uys' home. Carmelita testified the Uys' property was classified as "distressed" because it was in the process of being foreclosed upon. Carmelita stated that in November 2009 the real estate market "was at rock bottom" and the market had improved since November 2009; confirmed she had not attempted to sell their house since November 2009; and acknowledged that the damages to her house had worsened in the four and a half years since the accident.

Upon redirect examination of Carmelita, the Uys attempted to introduce the Allstate letter. Outside of the presence of the jury, the circuit court heard arguments from the parties' counsel as to whether the Uys should be allowed to present arguments and evidence concerning the Uys' homeowner's insurance and the reasons they filed the Complaint. The Uys argued that Inokuma and Spencer Homes had pointed out that the Uys had not attempted to sell their home after the November 2009 offer did not go through and that they should be able to explain (1) why they did not fix the home; (2) why they put their home on the market in "as is" condition; and (3) how they "spiraled into the foreclosure."

Kim argued that the Distressed Property and Short Sale documents were part of the November 6, 2009 purchase contract introduced by the Uys and had not expanded the scope to include the Uys' proposed areas of inquiry; the Uys were relying on the November 6, 2009 offer in order to establish stigma damages; and the purpose of the November 6, 2009 offer was "an attempt to compromise the mortgage and to get the [Uys] and the bank to be able to walk away." Kim argued that the Allstate letter was beyond the scope of his cross-examination and should not be admitted. Spencer Homes' counsel did not object to the admission

15

of the Allstate letter, but stated that if it were admitted he would use it to "declare a failure to mitigate claim."

The circuit court decided not to allow the Uys to discuss their homeowner's insurance and found that "the door has not been opened" and that the topic was beyond the scope of the cross-examination.

In the afternoon session of the July 23, 2012 hearing, the circuit court at first sustained objections to the Uys' counsel's attempts to admit the Badua Estimate and Sohn Estimate upon objection that they were hearsay and had not been moved into evidence. During the same proceedings, the circuit court heard arguments from parties' counsel concerning the Badua Estimate and Sohn Estimate. Spencer Homes had no objection to admitting the two estimates. The Uys' counsel argued it would be unfair to admit evidence of the Allstate letter without also admitting the Badua Estimate and Sohn Estimate, but also clarified that she was not offering the Allstate letter at that time. The circuit court stated it would not receive the Allstate letter into evidence at that time.

Upon direct examination at the July 23, 2012 hearing, Carmelita testified that the Uys listed the price of their home as $575,000 because "a couple of properties were sold" for over $600,000. Over objection, the Uys' attorney inquired if "the comparable that you found for $620[,000], was is [sic] similar to your house?" Carmelita affirmed that it was.

At the close of Carmelita's direct examination, the court gave the jury the following limiting instruction: "during the course of the questioning, you will hear questions about homeowners insurance. You should not consider the testimony whatsoever for the consideration of the damages."

Spencer Homes then cross-examined Carmelita. Carmelita said she called the Allstate adjuster who said she would send a contractor, but the contractor never came so Carmelita got estimates in August or September and gave them to Allstate. On July 31, 2012, Knox testified that on November 15, 2010, his construction company prepared a repair estimate for the Uys' home in the amount of $25,158. Knox said he reviewed materials sent

16

to him from the employee who conducted the site visit of the Uys' home and found the damages "did not look like a complex issue, certainly well within what I normally do in sending somebody for an initial inspection[.]"

### D. Construction equipment

On July 25, 2012, Charles Kulesa (**Kulesa**) appeared on behalf of Spencer Homes. Kulesa testified that in December 2007, the contruction site had twenty-five or thirty pieces of movable construction equipment, including the water tanker truck. Kulesa testified that no commercial licensed driver was needed for the water tanker truck because it was only driven on private property.

Kulesa testified that Spencer Homes did not maintain a record of which drivers were using different pieces of equipment on a daily basis; there was no gate or other obstruction to prevent someone from entering the construction site; Spencer Homes had not hired a security guard prior to December 16, 2007; and no alarm devices were installed in their vehicles. Kulesa testified that Spencer Homes did not have a policy regarding locking the doors of its heavy equipment, but noted that "a lot of the heavy equipment doesn't have doors on it and so there is no lock to lock." Kulesa denied knowledge of whether or not the doors on the water tanker truck had locking capabilities. Kulesa testified that "the general practice was to close the door on the vehicle when a work day was done[.]" Kulesa testified that key access to the water tanker truck was limited to four or five employees.

Kulesa testified that Spencer Homes had one key to the water tanker truck and it would be in the possession of the employee who last drove the water tanker truck. Kulesa denied knowledge of employees leaving the key in the water tanker truck cab for convenience and acknowledged Spencer Homes did not have a central repository for the water tanker truck key or a sign-out system for tracking the key. Kulesa testified that Spencer Homes' policy was "[t]hat if an individual had planned not to be in to work on the following workday or over the weekend or whatever, that he would have handed off his key to another guy."

Kulesa acknowledged that the operation of the water tanker truck by an untrained person would be a threat to the motoring public, and that he himself would not be able to safely park the water tanker truck.

On July 30, 2012, Spencer testified that no heavy equipment had ever been stolen from the Waikapu construction site other than the water tanker truck on the morning of the accident, but that a Jeep and a flat-bed truck had been stolen and the thefts were reported to the police. Counsel for Spencer Homes argued that at the time of the accident, there was "no reason" for Spencer Homes to hire security for its construction site.

**E. Motions**

On July 30, 2012, Spencer Homes moved for directed verdicts on the Uys' claims for negligence and stigma damages on the grounds that it did not have a duty to protect the Uys from the criminal acts of third parties and that the Uys had not established that their home would not return to its pre-accident value if repaired, respectively. Inokuma took no position on the Spencer Homes' motion for a directed verdict on its duty and joined in the motion for a directed verdict on stigma damages. The circuit court denied Spencer Homes' directed verdict motion on the issue of duty. The circuit court found "no evidence that lingering negative public perception would exist even after the house is fully repaired and there is no evidence for diminution of value after the property is repaired[;]" "no experts or appraisers testified as to stigma[;]" "no comparisons to a similarly damaged home[;]" "no opinion as to the amount of stigma that existed or the methods used to determine stigma[;]" and "[Carmelita's] testimony cannot establish stigma because she was not qualified as an expert on this issue . . . [and] had no prior experience or knowledge regarding stigma or damaged homes."

Inokuma made several oral motions at the July 30, 2012 hearing: (1) for JMOL that Inokuma had no actual knowledge of alcohol consumption by minors at her residence on the night of December 15 through December 16, 2007; (2) for a finding that insufficient evidence existed to establish that M.K., M.R., and K.R. were legally intoxicated at the time the water tanker truck

18

was abandoned; (3) for a finding that insufficient evidence existed to attribute the source of the minors' alcohol was the Inokuma residence; (4) for JMOL that Inokuma had no duty to control the behavior of M.K., M.R., and K.R. on the basis that no special relationship existed; and (5) for a finding that the intentional criminal conduct of M.K., K.R., and M.R. were superseding causes of the Uys' damages.

Specifically, Inokuma argued that no special relationship existed between herself and the three young men because "[s]he was never their legal guardian, never their adopted parent, never agreed to supervise them or anything like that." With regard to Inokuma's motion for a finding that the three young men were the superseding causes of the Uys' damages, Inokuma argued that even if she was negligent, her negligence was passive and therefore superseded by the intentional criminal conduct of the three young men. The Uys opposed all of Inokuma's oral motions.

On August 2, 2012, the Uys filed a motion for JMOL as to the liability of Spencer Homes.

At its August 3, 2012 hearing, the circuit court denied Spencer Homes' motion for JMOL that Spencer Homes owed no duty to the Uys. The circuit court found that a duty existed because there was a special relationship on behalf of Spencer Homes and Inokuma to protect the Uys from the criminal acts of third parties.

**F. Verdict**

On August 8, 2012, the jury returned its verdict, finding Spencer Homes, Inokuma, Luana Kaupe, the Rileys, and Reinhardt-Ortiz negligent and liable for damages in the amount of $42,500. Inokuma was found liable for damages under HRS § 663-41.

As relevant to the instant appeal, the special verdict form included the following questions and answers:

(1) Question No. 9 asked if Inokuma was liable to the Uys under HRS § 663-41, and the jury answered "Yes";

(2) Question No. 10 asked the jury to allocate liability for the Uys' property damage, which the jury did as

follows: Spencer Homes (30%), Luana Kaupe (60%), the Rileys (2.5%), Reinhardt-Ortiz (2.5%), and Inokuma (as an individual) (5%); and

(3) Question No. 13 asked if punitive damages should be awarded against the defendants, and the jury answered in the affirmative and awarded punitive damages against Spencer Homes in the amount of $12,500 and against Inokuma (as an individual) in the amount of $5,000.

## G. More motions, costs and Judgment

On August 15, 2012, Spencer Homes filed a motion for JMOL that it owed no duty to the Uys. Spencer Homes argued that it had no duty to protect the Uys from the criminal acts of the minor defendants because no special relationship existed between Spencer Homes and the Uys or the minor defendants.

On August 15, 2012, Spencer Homes filed a renewed motion for JMOL with regard to the jury's award of punitive damages.

On August 30, 2012, Inokuma filed a motion for taxation of costs against the Uys.

On August 31, 2012, Inokuma filed a substantive joinder to Spencer Homes' renewed motion for JMOL with regard to the jury's award of punitive damages.

On September 6, 2012, the Uys filed a motion for taxation of costs against all defendants. The Uys sought $47,772.28 in costs, but did not distinguish costs incurred prior to the May 18, 2011 settlement offer from those incurred afterwards.

On September 7, 2012, Spencer Homes filed a motion for costs against the Uys and an exhibit listing total costs in the amount of $24,813.10.

On September 24, 2012, the circuit court filed its order denying Spencer Homes' motion in limine no. 5 to preclude the Uys' punitive damages claim against Spencer Homes. On the same day, the circuit court filed its Stigma Damages Order granting Spencer Homes' motion for JMOL, and Inokuma's joinder to the motion, as to the Uys' claim for stigma damages.

Also on September 24, 2012, the circuit court filed its order denying Spencer Homes' motion for JMOL that it owed no duty to the Uys.

On September 28, 2012, the circuit court filed its Punitive Damages Order granting Spencer Homes' renewed motion for JMOL with regard to the jury's award of punitive damages, which reduced the Uys' award by $12,500.

On October 23, 2012, the Uys filed their notice of taxation of costs, appending a schedule of cost expenses totaling $13,887.53.

On November 9, 2012, the Uys filed an amended notice of taxation of costs in the amount of $12,107.43. The Uys' attorney declared that this amount represented costs incurred up until May 19, 2011.

On November 14, 2012, the circuit court filed its First Order on Taxation of Costs granting in part and denying in part the Uys' motion for taxation of costs against all defendants. The circuit court awarded the Uys costs as the prevailing party from December 16, 2007, the date of the subject incident, through May 19, 2011, the date Spencer Homes and Inokuma served an offer of settlement, which limited the Uys' recovery of costs pursuant to HRCP Rule 68.

On November 23, 2012, the circuit court filed an order granting Spencer Homes' motion for costs against the Uys.

Also on November 23, 2012, the circuit court filed its Second Order on Taxation of Costs granting Inokuma's motion for taxation of costs against the Uys, which awarded Inokuma $27,150.86 in costs.

On January 29, 2013, the circuit court entered its Final Judgment. The Final Judgment was entered in favor of the Uys and against all defendants, and specified that, inter alia, all defendants were jointly and severally liable to the Uys in the amount of $42,500 for property damage, and that Inokuma was individually liable for punitive damages in the amount of $5,000. Because the Uys were prevailing parties in the action, the circuit court awarded them $12,107.43 in costs. The Final Judgment allowed Inokuma and Spencer Homes to recover costs

accrued after May 18, 2011, the date of their HRCP Rule 68 settlement offer, in the amounts of $27,150.86 to Inokuma and $24,813.10 to Spencer Homes.

On February 6, 2013, the circuit court filed its order granting the Uys' November 9, 2012 amended notice of taxation of costs. The circuit court awarded the Uys' costs against Spencer Homes and Inokuma, jointly and severally, in the amount of $12,107.43.

Also on February 6, 2013, the circuit court filed its order denying the Uys' motion for JMOL as to the liability of Spencer Homes.

On February 8, 2013, Inokuma filed a motion to alter or amend the Final Judgment on the basis that it failed to state the attribution of liability amongst the defendants; failed to set forth specific amounts owed by each defendant pursuant to the jury verdict; and improperly stated that Inokuma's cross-claims for contribution were dismissed.

On February 12, 2013, the Uys filed their notice of appeal from the Final Judgment and six underlying orders in appellate case no. CAAP-13-0000088.

On March 11, 2013, Spencer Homes filed a substantive joinder to Inokuma's February 8, 2013 motion to alter or amend the Final Judgment. Spencer Homes requested the circuit court enter the judgment as proposed in Inokuma's motion.

On April 16, 2013, the circuit court filed its order granting Inokuma's motion to alter or amend the Final Judgment.

On April 26, 2013, the circuit court entered its Amended Final Judgment, which clarified that the defendants were liable for the following percentages of the damages awarded to the Uys: Spencer Homes (30%), Luana Kaupe (60%), the Rileys (2.5%), Reinhardt-Ortiz (2.5%), and Inokuma (as an individual) (5%). The Amended Final Judgment also clarified that Inokuma's liability was found pursuant to HRS § 663-41.

On April 29, 2013, the Uys filed an amended notice of appeal. Spencer Homes filed a notice of cross-appeal on April 30, 2013.

On June 28, 2013, this court filed an order dismissing the Uys' appeal and Spencer Homes' cross-appeal in appellate case no. CAAP-13-0000088 for lack of appellate jurisdiction.

On September 5, 2013, the circuit court entered its Second Amended Final Judgment, which clarified how the circuit court was disposing of each claim with regard to each defendant. The Second Amended Final Judgment also clarified that its Punitive Damages Order resulted in a directed verdict of $0 in punitive damages against Spencer Homes instead of the $12,500 awarded by the jury.

On September 13, 2013, Spencer Homes filed a motion to alter or amend the Second Amended Final Judgment because it did not include orders denying Spencer Homes' motion for judgment and motion for judgment notwithstanding the verdict on the issue of duty, and then on October 18, 2013, Spencer Homes withdrew the motion.

On November 14, 2013, the circuit court filed its Third Amended Final Judgment, which clarified that with regard to the circuit court's September 28, 2012 Order Denying Spencer Homes' Motion for JMOL on Duty, the circuit court "will not enter a judgment that Defendant Spencer Homes owes no duty to [the Uys]."

On November 27, 2013, the Uys filed its notice of appeal in this case no. from the Third Amended Final Judgment and underlying orders.

On December 6, 2013, Spencer Homes filed its notice of cross-appeal from the Third Amended Final Judgment and the September 28, 2012 Punitive Damages Order.

On December 10, 2013, Inokuma filed her notice of cross-appeal from the Third Amended Final Judgment.

## II. The Uys' Appeal

### A. The circuit court did not err in granting Spencer Homes' motion for summary judgment on the Uys' bodily injury claims.

The Uys contend the circuit court erred by finding that the $5,000 limitation of HRS § 431:10C-306(b)(4)[8] precluded the

---

[8] HRS § 431:10C-306(b)(4) provides that "[t]ort liability is not abolished as to the following persons, their personal representatives, or their legal guardians" when "[i]njury occurs to the person in a motor vehicle

Uys' bodily injury claims because their claims were viable under HRS § 431:10C-306(e)(1) and (2)(c).

HRS § 431:10C-306(e) provides:

**§431:10C-306 Abolition of tort liability.**

. . . .

(e) No provision of this article shall be construed to exonerate, or in any manner to limit:

(1)     The liability of any person in the business of manufacturing, retailing, repairing, servicing, or otherwise maintaining motor vehicles, arising from a defect in a motor vehicle caused, or not corrected, by an act or omission in the manufacturing, retailing, repairing, servicing, or other maintenance of a vehicle in the course of the person's business;

(2)     The criminal or civil liability, including special and general damages, of any person who, in the maintenance, operation, or use of any motor vehicle:

(A)     Intentionally causes injury or damage to a person or property;

(B)     Engages in criminal conduct that causes injury or damage to person or property;

(C)     Engages in conduct resulting in punitive or exemplary damages; or

(D)     Causes death or injury to another person in connection with the accident while operating the vehicle in violation of section 291E-61 or section 291-4 or 291-7, as those sections were in effect on or before December 31, 2001.

1.     **The circuit court did not err with regard to HRS § 431:10C-306(e)(1) because it did not apply to Spencer Homes.**

The Uys contend the circuit court erred because it did not conclude that the lock to the water tanker truck was broken at the time of the accident and that Spencer Homes' failure to correct this defect "was a substantial factor in the theft" of the truck and therefore that Spencer Homes failed to maintain the vehicle in the course of business under HRS § 431:10C-306(e)(1). The Uys contend that summary judgment was inappropriate because a genuine issue of material fact existed as to whether Spencer

---

accident and as a result of such injury that the personal injury protection benefits incurred by such person equal or exceed $5,000[.]" (Emphasis added.)

Homes "maintained" motor vehicles under HRS § 431:10C-306(e)(1). In their opposition to Spencer Homes' motion for summary judgment, the Uys argued that Spencer Homes maintained vehicles "in its business capacity" and a genuine issue of material fact existed as to whether it failed to maintain the water tanker truck.

Spencer Homes argues that it "is a general building contractor" and that the Uys failed to present any evidence that Spencer Homes is "in the _business_ of manufacturing, retailing, etc. motor vehicles" under HRS § 431:10C-306(e)(1).

The Uys' argument is without merit because HRS § 431:10C-306(e)(1) does not apply to Spencer Homes. In determining whether or not Spencer Homes was in the business of "otherwise maintaining motor vehicles" under HRS § 431:10C-306(e)(1), we are guided by the following principles of statutory interpretation:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, _in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context_, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

_Hawaii State Teachers Ass'n v. Abercrombie_, 126 Hawai'i 318, 320, 271 P.3d 613, 615 (2012) (quoting _Hawaii Gov't Emp. Ass'n, AFSCME Local 152, AFL-CIO v. Lingle_, 124 Hawai'i 197, 202, 239 P.3d 1, 6 (2010)) (emphasis added).

When read in context, it is clear that HRS § 431:10C-306(e)(1) applies to businesses whose primary purpose relates to motor vehicles, such as a car dealerships, service stations, or auto-body shops, not businesses whose maintenance, operation, or use of motor vehicles is secondary to their primary purpose, such as construction companies. _Compare_ HRS § 431:10C-306(e)(1) (providing that it applies to "any person in the business of manufacturing, retailing, repairing, servicing, or otherwise

maintaining motor vehicles"), with HRS § 431:10C-306(e)(2) (providing that it applies when specific injury, damage, or damages result from a person's maintenance, operation, or use of a motor vehicle). We therefore hold that the circuit court did not err with regard to HRS § 431:10C-306(e)(1) because that provision did not apply to Spencer Homes as a matter of law.

**2. The circuit court did not err with regard to HRS § 431:10C-306(e)(2)(C) because it did not apply to Spencer Homes.**

The Uys contend that the circuit court erred because "genuine issues of material fact existed as to whether Spencer Homes had engaged in conduct that could have resulted in punitive damages" and therefore its October 20, 2011 grant of summary judgment was inappropriate "given the statutory exception listed in HRS § 431:10C-306(e)(2)(C)." The Uys contend that punitive damages were warranted because Spencer Homes exhibited gross negligence by storing the water tanker truck unlocked "on a dark, unguarded and unfenced jobsite" and with the key in the ignition even though there was "a recent history of multiple vehicle thefts from the site[.]" The Uys contend the circuit court's September 24, 2012 order denying Spencer Homes' motion in limine No.5 to preclude the Uys' motion for punitive damages against Spencer Homes "implicitly recognized the existence of genuine issues of material fact" as to whether punitive damages were appropriate.

The Hawai'i Supreme Court discussed punitive damages in Masaki v. General Motors Corporation, 71 Haw. 1, 780 P.2d 566, (1989):

> Punitive or exemplary damages are generally defined as those damages assessed in addition to compensatory damages for the purpose of punishing the defendant for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future.
>
> Since the purpose of punitive damages is not compensation of the plaintiff but rather punishment and deterrence, such damages are awarded only when the egregious nature of the defendant's conduct makes such a remedy appropriate. Thus, where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award punitive damages. . . .

26

> In determining whether an award of punitive damages is appropriate, the inquiry focuses primarily upon the defendant's mental state, and to a lesser degree, the nature of his conduct. In the case of most torts, ill will, evil motive, or consciousness of wrongdoing on the part of the tort-feasor are not necessary to render his conduct actionable. In a negligence action, for example, the defendant may be required to make compensation if it is shown that he failed to comply with the standard of care which would be exercised by an ordinary prudent person, no matter how innocent of desire to harm. In contrast, to justify an award of punitive damages, a positive element of conscious wrongdoing is always required. Thus, punitive damages are not awarded for mere inadvertence, mistake, or errors of judgment.

Masaki, 71 Haw. at 6-7, 780 P.2d at 570-71 (emphasis added, citations, internal quotation marks, and brackets omitted).

The Masaki court further noted that to sustain a claim for punitive damages,

> [t]he plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.

Id. at 16-17, 780 P.2d at 575 (emphasis added).

Moreover, punitive damages may be awarded for gross negligence. See Kang v. Harrington, 59 Haw. 652, 663, 587 P.2d 285, 293 (1978) ("The proper measurement of punitive damages should be the degree of malice, oppression, or gross negligence . . . ." (citation, internal quotation marks and brackets omitted). "Gross negligence is an aggravated form of negligence, which differs from ordinary negligence only in degree and not in kind. It falls short of recklessness which is not wilful or wanton." State v. Bunn, 50 Haw. 351, 358, 440 P.2d 528, 534 (1968) (internal citation omitted). Gross negligence has also been described as a reckless and conscious indifference to the consequences that could arise. Ditto v. McCurdy, 86 Hawai'i 84, 92, 947 P.2d 952, 960 (1997). Ordinary negligence, on the other hand, "is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such person would not have done." Ward v. Inter-Island Steam Navigation Co., 22 Haw. 66, 69 (Haw. Terr. 1914). To establish negligence, the plaintiff must show "[f]irst, a breach of duty which defendant owed to him; second, a

27

negligent breach of that duty; and, third, injuries received thereby resulting proximately from that breach of duty." Grace v. Kumalaa, 47 Haw. 281, 292, 386 P.2d 872, 879 (1963) (citation and internal quotation mark omitted).

As noted above, HRS § 431:10C-306(e)(2)(C) applies to conduct that occurs while a person is maintaining, operating, or using a motor vehicle. While Spencer Homes' alleged actions and omissions suggest the company was negligent in its maintenance, operation, and use of the water tanker truck, its acts and omissions do not rise to the level of gross negligence or other conduct warranting punitive damages. The Uys did not put forth clear and convincing evidence that Spencer Homes acted with "a positive element of conscious wrongdoing" (Masaki, 71 Haw. at 7, 780 P.2d at 571) or conducted itself in a manner as to "raise the presumption of a conscious indifference to consequences." Masaki, 71 Haw. at 17, 780 P.2d at 575. We therefore hold that the circuit court did not err with regard to HRS § 431:10C-306(e)(2)(C).

Therefore, the circuit court did not err in granting summary judgment in favor of Spencer Homes on the Uys' bodily injury claims because neither HRS § 431:10C-306(e)(1) nor HRS § 431:10C-306(e)(2)(C) applied to Spencer Homes.

**B.    The circuit court did not err in granting Spencer Homes motion for judgment notwithstanding the verdict in regard to the Uys' claim for punitive damages.**

The Uys contend the circuit court erred by granting Spencer Homes' motion for judgment notwithstanding the verdict with regard to the jury's award of punitive damages because when considering the evidence and reasonable inferences in the light most favorable to the Uys, Spencer Homes' employees were grossly negligent. The Uys contend Spencer Homes' admission that the operation of the water tanker truck by an untrained person would be a public threat and the history of vehicle thefts from Spencer Homes' job sites constituted evidence of Spencer Homes' "conscious wrongdoing . . . ." The Uys further contend Spencer Homes knew its employees' alleged practice of leaving the key in the water tanker truck ignition was "wrong, and dangerous" and

28

therefore "ma[de] up that story" that a search for the driver with the water tanker truck key ensued whenever workers were assigned the task of spraying down the job site.

Spencer Homes' alleged failure to maintain the lock on the water tanker truck or to ensure that it was locked, hire a security guard, fence or gate its construction site, or otherwise prevent theft of its vehicles constitutes evidence of negligence and a failure to act reasonably in maintaining the Waikapu construction site. As stated supra, however, an award of punitive damages must be supported by more than evidence of negligence; an award of punitive damages requires evidence of a "positive element of conscious wrongdoing" (Masaki, 71 Haw. at 7, 780 P.2d at 571) on the part of the defendants or evidence that the defendants conducted themselves in a manner as to "raise the presumption of a conscious indifference to consequences." Masaki, 71 Haw. at 17, 780 P.2d at 575. The evidence presented by the Uys did not support an inference that Spencer Homes' conduct included a positive element of conscious wrongdoing and therefore fell short of the level of egregious conduct for which punitive damages could be awarded.

**C.    The circuit court did not err with regard to its evidentiary rulings.**

The Uys have not established that the circuit court erred in its application of HRE Rule 403. They contend that the circuit court prohibited them from presenting evidence supporting their reasons for bringing the case when it denied the Uys' request to present the Allstate letter. The Uys contend that they filed the suit because the offer from Allstate ($18,866.08) would cover only a small portion of the projected costs of fixing the damage to their home, according to the Badua Estimate ($119,790.90) and Sohn Estimate ($127,423.14).

The Uys contend that the circuit court "compounded its error by permitting defense counsel to imply, without any factual basis, that [the Uys] were greedily attempting to 'double dip' by collecting a judgment, only to allow their house to slide into foreclosure, while abundant collateral sources of funds existed with which [the Uys] could have fixed their home and paid their

mortgage" and preventing the Uys from admitting evidence "to demonstrate their real reasons for resorting to a lawsuit[.]"

The Uys have not established that the circuit court abused its discretion in applying HRE Rule 403. See Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 351, 944 P.2d 1279, 1294 (1997).

The Uys contend that the circuit court erred by permitting cross-examination concerning the Uys' home insurance for the purpose of establishing bias, interest, or motive in filing their complaint because such evidence was "completely irrelevant and highly prejudicial, requiring reversal." The Uys argue that "evidence of collateral sources of funds available to a plaintiff in a lawsuit, such as insurance proceeds, have been deemed irrelevant and inadmissible . . . to prove bias, interest or motive."

Spencer Homes contends that the circuit court did not err in allowing Spencer Homes' cross-examination of the Uys with regard to their home insurance because the cross-examination concerned the Uys' failure to mitigate damages prior to trial and that the Uys opened the door to the topic of mitigation damages. Spencer Homes contends that its cross-examination regarding the Uys' insurance sources of funds was a defense against the Uys' assertion that they could not accept the offer to purchase their home "[b]ecause the house is not fixed."

The circuit court allowed Spencer Homes' cross-examination in regard to the Uys' home insurance because it wanted "to give defense counsel some leeway into following up as far as bias, interest, and motive."

HRE Rule 411 provides:

> **Rule 411 Liability Insurance.** Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

The circuit court's ruling to admit evidence of the Uys' home insurance pursuant to HRE Rule 411 did not constitute reversible error because it went to the issue of mitigation of damages. See State v. Taniguchi, 72 Haw. 235, 239, 815 P.2d 24,

26 (1991) ("[T]the decision below is correct [and] it must be affirmed by the appellate court even though the lower tribunal gave the wrong reason for its action.").

Moreover, "[t]he 'collateral source rule,' in general, provides that benefits or payments received on behalf of a plaintiff, from an independent source, will not diminish recovery from the wrongdoer." Bynum v. Magno, 106 Hawai'i 81, 86, 101 P.3d 1149, 1154 (2004) (footnote omitted). The collateral source rule did not prohibit Spencer Homes' cross-examination of the Uys with regard to their insurance because it was not conducted for the purpose of diminishing the Uys' recovery, but rather to address the Uys' failure to mitigate damages.

**D.   The circuit court did not err in granting Spencer Homes' motion for a directed verdict JMOL on stigma damages.**

The Uys contend that the circuit court erred in granting Spencer Homes' motion for a directed verdict JMOL on stigma damages because (1) the "lowball" offer on their house that was "contingent upon the home being repaired to seller satisfaction" and (2) Carmelita's testimony as an expert in real estate constituted substantial evidence that the Uys' "home suffered a permanent stigma from being cracked open by a water tanker [truck]." The Uys argue "[e]xpert appraiser testimony was not necessary to establish stigma damages" because Hawai'i law requires experts only in "medical and legal malpractice cases." The Uys also argue that the issue of stigma damages should have gone to the jury because the "actual events supply evidence of value."

Spencer Homes argues that the circuit court did not err in granting Spencer Homes' motion for JMOL on stigma damages because the Uys "failed to prove the existence or value of any stigma damage to their house associated with the subject accident[.]" Spencer Homes argues that the Uys "failed to meet their burden of proving permanent, irredeemable damage to their property . . . [and] failed to prove that there will be any lasting stigma damage or diminution of value after the property is repaired."

The circuit court granted Spencer Homes' motion for a directed verdict on stigma damages because it found "no evidence that lingering negative public perception would exist even after the house is fully repaired and there is no evidence for diminution of value after the property is repaired[;] . . . no experts or appraisers testified as to stigma[;] . . . no comparisons to a similarly damaged home[;] . . . no opinion as to the amount of stigma that existed or the methods used to determine stigma[;] . . . [and Carmelita's] testimony cannot establish stigma because she was not qualified as an expert on this issue . . . [and] had no prior experience or knowledge regarding stigma or damaged homes."

Because no Hawaiʻi cases specifically address "stigma" damages, we look to other jurisdictions for guidance. The plaintiffs in Bradley v. Armstrong Rubber Co., 130 F.3d 168 (5th Cir. 1997) brought claims against a tire company for nuisance, trespass, strict liability, and negligence, alleging that the company "blew carbon black onto their properties and introduced a plume of petroleum naphtha into the soil and water under their properties." Bradley, 130 F.3d at 170. The plaintiffs argued that they were entitled to damages because even though the defendant tire company agreed to complete remediation, the completed remediation could take twenty years and would not remove all of the contamination and thus the value of their homes significantly decreased and suffered from "market stigma" as a result of the contamination. Id. at 171-72. The Bradley court held that the "phenomenon of 'market stigma' is a reduction in market price caused by the public's fear of contaminated property, which lingers even after contamination has been remediated." Id. at 175. In interpreting Mississippi law, the Bradley court held that stigma damages were recoverable when the subject property was permanently and physically injured and there is convincing evidence of market stigma. Id. at 176. The Bradley court further held that the plaintiffs failed to produce sufficient evidence to sustain their claim for stigma damages because their "expert provided no estimate of the amount by which

the value of the homes was reduced" and therefore they did not prove the diminution value with reasonable certainty.  Id.

In another contamination case, Walker Drug Co. v. La Sal Oil Co., 972 P.2d 1238 (Utah 1998), plaintiffs brought claims for nuisance and trespass against two oil companies alleging "that gasoline migrated underground from service stations owned by defendants . . . to properties owned [by the plaintiffs]."  Walker Drug Co., 972 P.2d at 1241.  The plaintiffs alleged that the gasoline "contaminated the groundwater and soil . . . [and] damaged the value of all three [of the plaintiffs'] properties and impinged upon their ability to use their properties as collateral for a loan."  Id.  The plaintiffs sought "stigma damages for an alleged decrease in the market value of" one of their properties.  Id. at 1247.  The Utah Supreme Court defined stigma damages as damages that "compensate for loss to the property's market value resulting from the long-term negative perception of the property in excess of any recovery obtained for the temporary injury itself."  Id. at 1246.  The Walker Drug Co. court held that stigma damages are recoverable "when a plaintiff demonstrates that (1) defendants caused some temporary physical injury to plaintiff's land and (2) repair of this temporary injury will not return the value of the property to its prior level because of a lingering negative public perception."  Id. at 1247.  The court held that the issue of stigma damages should have been submitted to the jury because the testimonies offered by the plaintiffs' witnesses were "the best evidence available for proving stigma damages given the circumstances."  Id. at 1248.

In Bartleson v. United States, 96 F.3d 1270 (9th Cir. 1996), plaintiffs brought suit against a military base alleging permanent nuisance and seeking damages for stigma to their properties allegedly caused by the military base's "live fire exercises . . . ."  Bartleson, 96 F.3d at 1272.  The Ninth Circuit held that "the district court correctly allowed the plaintiffs to proceed on a permanent nuisance theory" on their damages claim for "the diminution in their property values due to stigma caused by the past shelling of their properties and the

uncertainty regarding future shelling and the possible presence of unexploded shells on the properties." Id. at 1275. The court held that the permanent nuisance theory was appropriate "[b]ecause the artillery range is an instrument of the government that cannot be enjoined, like a public utility, and the shelling activities will continue[.]" Id. at 1276.

We find these authorities instructive and therefore hold that to sustain a claim for stigma damages, a plaintiff must produce convincing evidence that the defendant caused injury to the plaintiff's real property, and remediation will not return the value of the property to its prior level because of a lingering negative public perception. We also hold that the best available evidence is sufficient to send the issue of stigma damages to a jury; expert testimony is not required.

In the instant case, Carmelita testified that Eustaquio purchased their home in 2005; the Uys received only one offer of $375,000 in November 2009 and did not accept it because it was contingent on the completion of the repairs on the house and they had not fixed the house; a "comparable" home sold for $620,000; the real estate market "was at rock bottom" in November 2009 but had improved since;, Carmelita had not attempted to sell the Uys' house since November 2009; and the damages to the Uys' house had worsened in the four and a half years since the accident. LaPrade testified that his recommended repairs would correct all accident-related damage and restore the house to its pre-accident condition.

The circuit court did not err in granting Spencer Homes' motion for JMOL on stigma damages because Carmelita's testimony did not constitute the best available evidence that even if repairs were completed, the value of the Uys' property would not return to its pre-water tanker truck accident level due to a lingering negative public perception.

E.    **The circuit court erred in enforcing the HRCP Rule 68 offer.**

The Uys contend the circuit court erred by enforcing the $50,000 offer made pursuant to HRCP Rule 68 by Spencer Homes and Inokuma because the offer "was unenforceable . . . ; it

34

failed to bring finality, and it violated public policy." The Uys argue that the offer was unenforceable because it "did not fully and completely resolve the claim or claims to which the offer was directed" and was ambiguous and lacked finality and thus was illusory. The Uys felt the offer was void as a matter of public policy because it was conditioned on "the acceptance of the offer by the other Plaintiff" and therefore was illusory. The Uys contend the circuit court erred in enforcing the offer because the final judgment awarded the Uys was $54,607.43, more than the $50,000 offer.

Spencer Homes argues that the HRCP Rule 68 offer is enforceable because Spencer Homes and Inokuma were held liable for 30% and 5% of the repair damages awarded to the Uys, respectively, and therefore, "[e]ven if the punitive damages awarded against Spencer Homes is kept in the mix, the total jury award attributable to Spencer Homes and [Inokuma] is only $32,375.00, or $17,625.00 less than the $50,000.00 offer settlement." Spencer Homes also argues that the terms of the offer were "clear, unambiguous, and final."

It is undisputed that defendants Spencer Homes and Inokuma made a joint offer of settlement to the Uys in the amount of $50,000, inclusive of all costs and attorneys' fees accrued through the time of the settlement.

The circuit court entered its Final Judgment in favor of the Uys and against all defendants and specified that all defendants were jointly and severally liable to the Uys in the amount of $42,500 for property damage, and that Inokuma was individually liable for punitive damages in the amount of $5,000. The circuit court awarded the Uys $12,107.43 in costs, the amount that the Uys sought for costs incurred up to May 19, 2011, the date of the settlement offer. Because the circuit court did not include the Uys' pre-offer costs in its calculation, it concluded that the Uys' judgment was for $47,500 and therefore that Inokuma and Spencer Homes were entitled to recover costs accrued after the date of their $50,000 settlement offer pursuant to HRCP Rule 68.

HRCP Rule 68, provides, in pertinent part:

Rule 68.    OFFER OF SETTLEMENT OR JUDGMENT

> At any time more than 10 days before the trial begins, any party may serve upon any adverse party an offer of settlement or an offer to allow judgment to be taken against either party for the money or property or to the effect specified in the offer, <u>with costs then accrued</u>. . . . If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.

(Emphasis added.)

An offer made pursuant to HRCP Rule 68 includes the costs accrued up until the date of the settlement offer, and therefore when determining whether a final judgment is more favorable than the offer, a court should include the pre-offer costs awarded in its calculation.  <u>See, e.g.</u>, <u>Marek v. Chesny</u>, 473 U.S. 1, 7 (1985) (holding that post-offer costs should not be included in the calculation made pursuant to Federal Rules of Civil Procedure (**FRCP**) Rule 68[9]); <u>Bell v. Bershears</u>, 92 S.W.3d 32, 37 (Ark. 2002) (holding that pre-offer costs should be considered in determining whether the judgment exceeds the offer made pursuant to Arkansas Rules of Civil Procedure Rule 68)[10]; 20 Am. Jur. 2d Costs § 17 (providing that costs and attorneys' fees incurred prior to an offer should be included in the calculation

---

[9]    FRCP Rule 68 is very similar to HRCP Rule 68.  It provides, in pertinent part:

> **(a) Making an Offer; Judgment on an Accepted Offer**. At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued.
>
> . . . .
>
> **(d) Paying Costs After an Unaccepted Offer**. If the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made.

[10]    Arkansas Rules of Civil Procedure Rule 68 ("OFFER OF JUDGMENT")is almost identical to that of HRCP Rule 68:

> At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against him for the money or property or to the effect specified in his offer, with costs then accrued. . . . If the judgment exclusive of interest from the date of offer finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.

used to determine whether the judgment obtained was more favorable than the rejected offer).[11]

The circuit court erred because it did not include the pre-offer costs awarded to the Uys in its calculation used to determine whether the judgment obtained was more favorable than the rejected offer. Excluding the punitive damages assessed against Inokuma, the Uys' final judgment was for $54,607.43 and therefore the circuit court's awards of costs to Inokuma and Spencer Homes pursuant to HRCP Rule 68 must be vacated.

### III. Spencer Homes' cross-appeal

On cross-appeal, Spencer Homes contends that the circuit court erred by denying Spencer Homes' motion for JMOL that it owed no duty to the Uys and by finding a special relationship on behalf of Spencer Homes and Inokuma to "protect [the Uys] from the criminal acts of third parties." Spencer Homes contends that no special relationship existed between itself and either the minor defendants or the Uys and therefore judgment that they owed no duty to the Uys was proper as a matter of law.

The Uys contend that "Spencer Homes' duty did not flow from a special relationship, but rather, from its creation of foreseeable, and serious, harm in the storage of its heavy vehicular equipment in and around its job site." The Uys argue that the circuit court did not err in denying Spencer Homes' motion for JMOL on the issue of duty because as "the owner of a 52,000 pound [water tanker truck], stored on a lot with a history of vehicle theft, and subject to rolling away (unless an unmarked yellow valve switch is set)," Spencer Homes should have taken "reasonable steps to avoid the foreseeable serious injury and damage which could flow from the misappropriation and misuse of its [water tanker truck]."

The "general rule is that a person does not have a duty to act affirmatively to protect another person from harm." Lee v. Corregedore, 83 Hawai'i 154, 159, 925 P.2d 324, 329 (1996).

---

[11]    Nothing in HRCP Rule 68 supports Spencer Homes' argument that the circuit court's awards of costs to Spencer Homes and Inokuma should be affirmed because the jury found them responsible for only 30% and 5% of the repair damages, respectively.

Exceptions to this general rule exist where there is a "special relationship" between a "defendant and either the third person who may threaten harm or the party who is the [potential] victim of the harm[.]" Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 386, 742 P.2d 377, 384 (1987). "In determining whether such a relationship exists, this court looks to section 314A of the Restatement (Second) of Torts, which sets forth a non-exclusive list of 'special relationships' upon which a court may find a duty to protect." Maguire v. Hilton Hotels Corp., 79 Hawai'i 110, 113, 899 P.2d 393, 396 (1995). The Restatement (Second) of Torts § 314A (1965) provides:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>
>> (a) to protect them against unreasonable risk of physical harm, and
>>
>> (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> (2) An innkeeper is under a similar duty to his guests.
>
> (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.
>
> (4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

In addition to this non-exclusive list, other special relationships may exist because "[w]hether a person owes another a duty reasonably to protect the other from foreseeable harm by a third person depends upon whether the circumstances warrant the imposition of such a duty." Doe Parents No. 1 v. State, Dep't of Educ., 100 Hawai'i 34, 71, 58 P.3d 545, 582 (2002).

In Cruz v. Middlekauff Lincoln-Mercury, Inc., 909 P.2d 1252 (Utah 1996), the Utah Supreme Court identified the following "special circumstances" under which "key-in-ignition" cases have been permitted to go forward:

> (1) significant criminal activity in the area in which the vehicle was left, (2) prior thefts of the defendant's vehicles, (3) irresponsible or reckless nature of people frequenting the area, (4) lack of surveillance of the vehicle, (5) vehicle left for extended period of time, and (6) type and size of vehicle uniquely attractive or capable of inflicting serious damages.

Cruz, 909 P.2d at 1255-56 (citations omitted).

The Cruz court also noted that "[o]ther special circumstances include the vehicle's access to public highways, its accessibility to the public, its operational condition, and the time of day or night the vehicle was taken." Id. at 1256.

The plaintiffs in Cruz suffered serious injuries and the death of their unborn child when they were struck by a vehicle that had been stolen from a car dealership. Id. at 1253. The plaintiffs brought suit against the car dealership alleging that "it was foreseeable that its thief-operated cars would be recklessly or negligently driven and cause injury and death to members of the public." Id. In concluding that the trial court correctly denied the car dealership's motion to dismiss because the issue of foreseeability should have been determined by the jury, the Cruz court explained:

> Obviously a vehicle is more likely to be stolen if it is unlocked and its key is in its ignition. However, the Cruzes point to other conditions that significantly increased the likelihood of the theft. These include the numerous prior thefts of Middlekauff's key-in-ignition cars, the public's unlimited access to the cars, Middlekauff's management policy of leaving keys in the ignitions of cars parked for lengthy periods of time in a commercial area, the cars' location permitting their unobstructed exit, and Middlekauff's lack of surveillance or security, even during evening hours. If these unusual circumstances can be proved, a fact finder could determine that the theft was foreseeable.
>
> The foreseeability of the theft alone, however, does not create a duty by Middlekauff to the Cruzes. The duty arises only if it was also foreseeable that Middlekauff's thief-operated cars would be recklessly or negligently driven and cause injury and death to members of the public. The Cruzes allege that it was foreseeable "that a thief who took one of Middlekauf[f]'s cars would attempt to evade capture by fleeing a police officer at high speed, which would result in a serious accident to an innocent motorist." Other courts have observed that thief-driven vehicles often collide with third parties, causing injury and death. A thief primarily concerned with avoiding detection and arrest may disregard traffic laws, endangering pedestrians and motorists alike. Also relevant in this case is the relatively short time-a few hours at most-between the theft of the car and the accident injuring the Cruzes.

Id. at 1256 (footnote and citations omitted).

We find Cruz highly instructive and applicable. It was foreseeable that Spencer Homes' water tanker truck could be stolen if measures were not taken to prevent theft, and that if stolen, the thief was likely to have difficulty driving the water

tanker truck safely, and therefore that members of the public would be at risk of incurring damages and/or suffering injuries. Our conclusion is supported by the following circumstances: (1) a Jeep and a flat-bed truck had been stolen from Spencer Homes' construction site prior to the accident; (2) at night, the water tanker truck was stored in an unlit, unfenced, and unguarded area within the construction site; (3) the doors of the water tanker truck either did not lock or were broken on the night of the accident, and Spencer Homes did not have a policy requiring drivers to lock the doors of heavy equipment; (4) Spencer Homes' representatives testified that the water tanker truck posed a danger when driven by untrained drivers due to its size and weight; and (5) the water tanker truck was stored in area easily accessible by the public via public roads and in close proximity to residences.

We hold that the circuit court did not err in denying Spencer Homes' motion for JMOL on the issue of duty because the imposition of a duty is warranted under the circumstances of the instant case. Spencer Homes was negligent for leaving the keys to the water tanker truck easily accessible to thieves, whether in the ignition or merely in the truck and regardless of whether Spencer Homes had a policy prohibiting its employees from doing so. We therefore affirm the circuit court's denial of Spencer Homes' motion for JMOL on the issue of duty.

**IV. Inokuma's cross-appeal**

On cross-appeal, Inokuma contends that the circuit court erred by: (1) denying Inokuma's motion for JMOL as to the inapplicability of HRS § 663-41; (2) denying Inokuma's motion for JMOL as to the inexistence of her legal duty to control the intentional criminal conduct of M.K., M.R., and K.R.; and (3) denying Inokuma's motion for JMOL on the issue of punitive damages.

**A. The circuit court did not err in denying Inokuma's motion for JMOL with regard to her liability under HRS § 663-41.**

Inokuma contends that the circuit court erred by

denying her motion for JMOL under HRCP Rule 50(a) because inadequate evidence supported the finding that Inokuma violated HRS § 663-41. Inokuma argues that there was no evidence that she provided alcohol to minors or knew that the minors were consuming alcohol at her home as required to find a violation of HRS § 663-41(a)(1) and (2). Inokuma contends the circuit court's error was compounded by the phrase "acts knowingly" in jury instruction No. 41 because "acts knowingly" is not included in HRS § 663-41. Inokuma also contends that there was insufficient evidence to establish that the minor defendants were intoxicated when they abandoned the water tanker truck so as to meet a requirement under HRS § 663-41.

Both M.K. and M.R. testified that on the weekends during the fall of 2007, they drank alcohol at the Inokuma residence, the alcohol was knowingly supplied by Inokuma, and sometimes Inokuma drank alcohol with them. M.R. also testified that at the time of the water tanker truck accident, his level of intoxication was a "[t]en out of ten." M.K. testified that on a scale of one to ten, his level of intoxication at the Inokuma residence after midnight on the morning of the accident was a "ten or 11 . . . ."

When reviewing a motion for JMOL under HRCP Rule 50, "the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and [the] motion may be granted only where there can be but one reasonable conclusion as to the proper judgment." Kramer v. Ellett, 108 Hawai'i 426, 430, 121 P.3d 406, 410 (2005) (internal quotation marks omitted) (quoting Nelson v. University of Hawaii, 97 Hawai'i 376, 393, 38 P.3d 95, 112 (2001)).

The circuit court did not err in denying Inokuma's motion for JMOL because M.K. and M.R.'s testimonies indicate that there is more than one reasonable conclusion as to whether Inokuma was liable under HRS § 663-41(1) for furnishing or providing alcohol to minors who became intoxicated and caused damage to the Uys' property.

41

### B. The circuit court did not err in denying Inokuma's motion for JMOL on the issue of duty.

Inokuma also contends that the circuit court erred by denying her motions for JMOL as to the inexistence of a legal duty obligating her to control the behavior of M.K., M.R., and K.R. and for a finding that the intentional criminal conduct of the three young men constituted a superseding cause of the Uys' damages. At the hearing where Inokuma raised the motions, she argued that no special relationship existed between herself and the three young men because "[s]he was never their legal guardian, never their adopted parent, never agreed to supervise them or anything like that[,]" and that even if Inokuma was negligent, her negligence was passive and therefore superseded by the intentional criminal conduct of the three young men.

As noted above, in determining whether a special "relationship exists, this court looks to section 314A of the Restatement (Second) of Torts," Maguire, 79 Hawai'i at 113, 899 P.2d at 396, which provides in relevant part:

> (4) One who is required by law to take or who <u>voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection</u> is under a similar duty to the other.

(Emphasis added.)

> Comment (b) to section 314A provides:

> This Section states exceptions to the general rule, stated in § 314, that the fact that the actor realizes or should realize that his [or her] action is necessary for the aid or protection of another does not in itself impose upon him [or her] any duty to act. The duties stated in this Section arise out of special relations between the parties, which create a special responsibility, and take the case out of the general rule. The relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found. . . . The law appears, however, to be working slowly toward a recognition of the <u>duty to aid or protect in any relation of dependence</u> or of mutual dependence.

(Emphasis added.)

As discussed <u>supra</u>, it is reasonable to conclude, based on the testimonies of M.R. and M.K., that Inokuma habitually permitted, and perhaps even encouraged, M.R. and M.K. to drink

her alcohol to the point of intoxication at the Inokuma residence. It is also reasonable to conclude that once intoxicated, the young men became dependent on Inokuma because they "were deprived of their normal opportunities for protection" and therefore Inokuma had a duty to protect them from harm and to prevent them from harming others. Restatement (Second) of Torts § 314A(4). The circuit court did not err in denying Inokuma's motion for JMOL on the issue of duty.

    **C.**    **The circuit court did not err in denying Inokuma's motion for JMOL on punitive damages.**

Inokuma's third contention is that the Uys failed to present clear and convincing evidence to support an award of punitive damages against Inokuma and that the jury's assessment should be set aside.

As discussed <u>supra</u>, to sustain a claim for punitive damages,

> [t]he plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief <u>or criminal indifference to civil obligations</u>, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.

<u>Masaki</u>, 71 Haw. at 16-17, 780 P.2d at 575 (emphasis added).

At trial, both M.K. and M.R. testified that they drank alcohol in the living room of the Inokuma residence on the night prior to the morning of the accident. M.K. was seventeen at the time of the accident and M.R. was fifteen. M.K. testified that while they were drinking, Inokuma came out of her bedroom, walked through the living room and past the group, went into the kitchen to get a glass of water, and then went back to her bedroom. M.R. testified that he believed Inokuma was home while they were drinking because her bedroom light was on when they got there. M.R. also testified that while in the living room of the Inokuma residence, the youths were drinking vodka and rum out of liquor bottles, and that they drank there for a few hours with the lights on while watching TV and were not trying to be quiet. Additionally, both young men testified that they regularly drank

alcohol that belonged to Inokuma at the Inokuma residence on the weekends during the fall of 2007, and Inokuma either served them the alcohol or gave them permission to help themselves to Inokuma's alcohol. A reasonable jury could have found, based on the testimonies of M.K. and M.R., that the Uys presented clear and convincing evidence that Inokuma exhibited criminal indifference to civil obligations by recklessly permitting M.K. and M.R. to possess intoxicating liquor while at the Inokuma residence in violation of HRS § 712-1250.5 (Supp. 2006), which provides, in pertinent part:

> **§712-1250.5 Promoting intoxicating liquor to a person under the age of twenty-one.** (1) A person . . . commits the offense of promoting intoxicating liquor to a person under the age of twenty-one if the person knowingly:
>
> . . . .
>
> (b) Permits a person to possess intoxicating liquor while on property under his control, and the person possessing the intoxicating liquor is a person under the age of twenty-one.
>
> . . . .
>
> (3) The fact that a person engaged in the conduct specified by this section is prima facie evidence that the person engaged in that conduct with knowledge of the character, nature, and quantity of the intoxicating liquor possessed, distributed, or sold.
>
> . . . .
>
> (4) Promoting intoxicating liquor to a person under the age of twenty-one is a misdemeanor.

We therefore hold that the circuit court did not err in denying Inokuma's motion for JMOL on the issue of punitive damages and affirm the circuit court's award of punitive damages against Inokuma.

## V. CONCLUSION

Therefore, IT IS HEREBY ORDERED that the November 14, 2013 "Third Amended Final Judgment," entered in the Circuit Court of the Second Circuit is vacated in part and affirmed in part. We vacate the parts of the "Third Amended Final Judgment" awarding costs to Spencer Homes and Inokuma. We affirm the circuit court in all other respects. The September 28, 2012 "Order Denying Spencer Homes Inc.'s Motion for Judgment as Matter

of Law that Defendant Spencer Homes Owes No Duty to Plaintiffs," also entered in the Circuit Court of the Second Circuit is affirmed.

DATED: Honolulu, Hawai'i, May 29, 2015.

On the briefs:

Mark S. Davis
Michael K. Livingston

Loretta A. Sheehan
Matthew C. Winter
Clare E. Connors
(Davis Levin Livingston)
for Plaintiffs/Appellants/
Cross-Appellees Eustaquio Uy
and Carmelita Uy.

Leslie R. Kop
Brenda E. Morris
Randall Y. Kaya
Adrian Y. Chang
(Law Offices of Leslie R. Kop)
for Defendant/Cross-Claim
Plaintiff/Cross-Claim
Defendant/Appellee/Cross-
Appellant Spencer Homes, Inc.,
a Domestic For-profit
Corporation.

Curtis C. Kim
for Defendant/Cross-Claim
Defendant/Cross-Claim
Plaintiff/Appellee/Cross-
Appellant Rae Inokuma, as
Parent or Guardian of K.I., a
Minor; and Rae Inokuma, an
Individual.

Presiding Judge

Associate Judge